IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

UNITED STATES OF AMERICA,

       Plaintiff,

v.                                  Case No. 25-10133-JWB

MICHAEL J. MADDEN,

       Defendant.

## MEMORANDUM AND ORDER

This matter is before the court on Defendant's motions to suppress.  (Docs. 28, 29, 30.) The motions are briefed and ripe for decision.  (Docs. 37, 38, 41, 42.)  The court held a hearing on June 3–4, 2026.  For the reasons stated herein, the motions are DENIED IN PART and DENIED AS MOOT IN PART.

## I.    Facts

After hearing testimony and receiving exhibits, the court finds the following facts by a preponderance of the evidence in accordance with Rule 12(d) of the Federal Rules of Criminal Procedure.  *United States v. Shrum*, 908 F.3d 1219, 1229 n.7 (10th Cir. 2018).

### A.  February 26, 2025

On February 26, 2025, Wichita Police Officers John Thornton and Tyler Page were conducting surveillance of Michael Madden's ("Defendant's") residence in response to a series of recent drive-by shootings at his home.  At least four shootings had been reported over the preceding three months, including one the day before on February 25.  Officer Thornton testified that his objective in surveilling the residence was to determine who was responsible.  At approximately 10:07 p.m., on the night of February 26, Thornton saw a black Ford F-150 pick-up truck leave the

1

residence carrying two occupants and followed it.  He was unable to identify either occupant. While following the vehicle, Thornton ran the truck's tag, and the return reflected that the tag had been "removed"—that is, it was not properly registered to the vehicle to which the plate was then attached.  Thornton testified he knew this to be a violation of Kansas law.

The officers then initiated a stop.  Thornton approached the driver's side and Page the passenger's side, both testifying that the pick-up had heavily tinted windows.  Further, they both gave several commands to lower the windows.  Madden, who was in the driver's seat, lowered the window a couple of inches; however, the bodycam footage indicates that Thornton's view of the interior of the cab was significantly impeded.  Thornton then asked the driver for identification, registration, and proof of insurance, but none was provided.  Thornton testified he did not know the driver was Madden until Madden volunteered his own name, stating "You know who I am . . . Michael Madden is my name."  (Thornton Video at 4:10:02–4:10:38.)[1]  After Madden produced no documentation, Thornton directed him to step out of the vehicle approximately eleven times. (*Id*. at 4:09:44–4:12:56.)  Madden refused, repeatedly demanding to speak with Thornton's sergeant.  Eventually Thornton and Page physically removed Madden from the vehicle and detained him.  Thornton then conducted a protective sweep of the vehicle, which he attributed to his knowledge of Madden's history of violence and gang affiliations.[2]  During the sweep of the center console area, Thornton observed what appeared to be methamphetamine and a .22 caliber round near the passenger seat.  (*Id*. at 4:15:11–4:16:13.)  Meanwhile, Thornton directed the passenger, Terran Pearsall, to exit and sit on the curb, and she complied.

---

[1] The bodycam videos from Officers Clayton, Johnson, Page, Thornton, and Lieutenant Lenzi were played during the suppression hearing.  In the top right-hand corner of each bodycam video is a timestamp.  When the court cites to a particular officer's bodycam footage, the number references the timestamp at the top right-hand corner of the footage.
[2] At the hearing, Officer Thornton testified he was familiar with Madden.  He discussed three prior contacts, one resulting in an arrest, and stated that the two earliest contacts involved potential violence directed at police.  Further, Officer Page testified that he observed a blue bandana in Madden's left rear pocket during the February 26 traffic stop, which he associated with gang membership.

While Thornton searched the vehicle, Page moved Madden away from the truck. Upon Thornton informing Page that he had discovered methamphetamine in the vehicle, Page patted down Madden and recovered a single 9mm bullet from Madden's right front pocket. (Page Video at 4:12:33–4:17:12.) About one hour later, Thornton testified that he then advised Madden of his *Miranda* rights, Madden waived them, and Madden admitted that he found the bullet on his porch and picked it up with the intent of throwing it away. (Thornton Video at 5:24:39–5:25:13, 5:31:50–5:32:18.) Thornton testified that the bases for Madden being detained were (1) the removed tag, (2) the absence of identification, registration, and insurance, and (3) felon in possession of ammunition. Thornton acknowledged that no methamphetamine was found on Madden's person and that the officers did not run Madden's name to determine whether he had a valid identification. Eventually, Madden was released from custody after Thornton's supervisor directed it at approximately 1:15 a.m. on the morning of February 27. This encounter forms the basis for the government charging Madden with felon in possession for the 9mm round found in his pocket ("Count I"). (Doc. 25 at 1.)

**B. February 27, 2025**

The next morning, at approximately 10:47 a.m., Wichita Police responded to a welfare-check call. A gas-station manager called 911 to report a man slumped over in the driver's seat of a vehicle that was parked in front of a gas pump for approximately an hour. A customer informed the manager of this and told the manager that he had turned off the vehicle. The vehicle was a white Cadillac.

Officer Darrel Johnson arrived first and approached the vehicle, noticing a city street sign in the back seat of the vehicle as he approached. Johnson along with his partner, Officer Boyd, questioned the individual, asking what he was doing and whether he had consumed drugs or

3

alcohol, which he denied.  Upon requesting and being handed valid identification, Johnson learned it was Madden.  Madden stated he had no proof of insurance because he had just purchased the vehicle.  Madden also informed Johnson that he was an active gang member.  While speaking to Madden, Johnson observed that Madden's pupils appeared constricted.  (Johnson Video at 16:59:25–16:59:38, 17:02:40–17:02:55, 17:13:31–17:13:49.)  Johnson testified that upon noticing the constricted pupils, Madden was not free to leave until the officers confirmed he could do so safely.  Thus, Johnson asked Madden to perform a field sobriety test and Madden agreed.  During Johnson's questioning of Madden, he asked to call Phillip White, identifying White as his attorney. (*Id*. at 17:10:13–17:10:43.)

Once Madden exited the vehicle, Johnson and Boyd escorted him about 20 feet from his vehicle to conduct the field sobriety test.  During this time, while looking into the vehicle through the windows, Lt. Lenzi and Officer Clayton observed a street sign bearing the word "Hoover" in the back seat of the white Cadillac.  (Clayton Video at 16:52:30–16:52:38.)  Lt. Lenzi testified he viewed the sign as possible evidence of theft.  Officers also observed a white crystalline substance on the front passenger seat.  At Lt. Lenzi's direction, Clayton conducted a field test of the crystalline substance, and the test was positive for methamphetamine.  Accordingly, before the field sobriety test was completed, Lt. Lenzi instructed Johnson and Boyd to arrest Madden.  Lt. Lenzi testified that the positive test for methamphetamine and the street sign served as the basis for the arrest.  Following the arrest, Boyd searched Madden and recovered one .22 caliber cartridge from his left front pocket.  (Johnson Video at 17:59:49–18:01:00.)  The trunk of the Cadillac was also searched after the arrest and Lt. Lenzi testified it contained two 50-round boxes of ammunition.

This encounter forms the basis for the government charging Madden with felon in possession for the .22 round found in his pocket ("Count II"). (Doc. 25 at 2.) On April 13, 2026, Madden moved to suppress all evidence and statements made during the February 26 and 27 encounters. (Docs. 28, 29, 30.) The government argues the motions should be denied. (Docs. 37, 38.) Following Madden's replies (Docs. 41, 42) and the hearing, the court is prepared to rule.

## II.    Standard

The Fourth Amendment to the United States Constitution provides that:

> [t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const. amend. IV. The Supreme Court has liberally interpreted "seizures" to encompass routine traffic stops, "even though the purpose of the stop is limited and the resulting detention quite brief." *See Delaware v. Prouse*, 440 U.S. 648, 653 (1979). An initial traffic stop is justified at its inception if "an officer has (1) probable cause to believe a traffic violation has occurred, or (2) a reasonable articulable suspicion that a particular motorist has violated any of the traffic or equipment regulations of the jurisdiction." *United States v. Winder*, 557 F.3d 1129, 1134 (10th Cir. 2009). "Reasonable suspicion requires that an officer provide 'some minimal level of objective justification.'" *United States v. Vercher*, 358 F.3d 1257, 1261 (10th Cir. 2004) (citing *I.N.S. v. Delgado*, 466 U.S. 210, 217 (1984)). This requires only "a showing considerably less than preponderance of the evidence." *Id.* at 1263 (citing *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000)). The court's standard for evaluating a traffic stop is objective, rather than subjective. *Winder*, 557 F.3d at 1135. Once an officer observes a traffic violation, "a *Terry* stop is objectively justified, regardless of the detaining officer's subjective motives." *Id.* (quotation omitted).

5

A warrantless arrest of a person is reasonable under the Fourth Amendment if the arresting officer has probable cause to believe that the suspect committed a crime in the officer's presence. *D.C. v. Wesby*, 583 U.S. 48, 56–57 (2018). "Probable cause to arrest exists where, under the totality of the circumstances, a reasonable person would believe that an offense has been committed by the person arrested." *United States v. Martin*, 613 F.3d 1295, 1302 (10th Cir. 2010) (internal quotations omitted). This inquiry is objective. *Apodaca v. City of Albuquerque*, 443 F.3d 1286, 1289 (10th Cir. 2006). "To determine whether an officer had probable cause for an arrest, 'we examine the events leading up to the arrest, and then decide 'whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to' probable cause.'" *Wesby*, 583 U.S. at 56–57 (citations omitted). "Because probable cause 'deals with probabilities and depends on the totality of the circumstances,' . . . it is 'a fluid concept' that is 'not readily, or even usefully, reduced to a neat set of legal rules.'" *Id*. (citations omitted). It "requires only a probability or substantial chance of criminal activity, not an actual showing of such activity." *Id*. (quoting *Illinois v. Gates*, 462 U.S. 213, 243–44, n.13 (1983)). Probable cause "is not a high bar: It requires only the 'kind of 'fair probability' on which 'reasonable and prudent [people] . . ., act.'" *Kaley v. United States*, 571 U.S. 320, 338 (2014).

## III. Analysis

As with the facts section, the following analysis is split between Madden's two encounters with Wichita police officers on February 26 and 27, respectively.

### A. February 26, 2025

#### 1. The Initial Traffic Stop Was Lawful

Madden argues that the initial stop lacked reasonable articulable suspicion. (Doc. 28 at 6–8.) In support, he contends that the license-plate check Officer Page ran was simultaneous with

6

the stop and therefore pretextual, that his gang-database designation and "armed and dangerous" flag could not justify the stop, and that merely leaving a surveilled residence supplied no suspicion. In his reply, he presses *United States v. Williams*, 169 F.4th 1227 (10th Cir. 2026), for the proposition that a gang-database flag, unaccompanied by observed present conduct, cannot justify an investigative seizure. (Doc. 41 at 2–3.)  The government does not defend the stop on the gang-designation or departure grounds; it maintains the stop was justified because the truck's tag had been "removed" and was not assigned to the vehicle, an arrestable misdemeanor under Kansas law.[3]  (Doc. 37 at 9–10.)  The court agrees with the government.

A traffic stop is justified at its inception if the officer has reasonable articulable suspicion that a traffic violation has occurred. *Winder*, 557 F.3d at 1134.  The inquiry is objective: once a violation is observed, the stop is justified regardless of the officer's subjective motives.  *Id.* at 1135.  In the instant matter, the officer's testimony resolves the dispute.  While following the truck, Thornton testified that he ran the tag and the return reflected that it had been "removed"—that is, not properly registered to the vehicle on which it was displayed.  This is a violation of Kansas law.[4]  At the hearing, the government introduced as an exhibit a photo that Thornton had taken of his patrol vehicle's dashboard computer database which indicated that the tag on the vehicle had been removed.  (Government Ex. 9A.)  Moreover, the timestamp on the screenshot was within one second of the time the car stop was initiated, as indicated by the Sedgwick County Emergency Communications call log.  (Defendant's Ex. C.)  That violation supplied reasonable suspicion to

---

[3] *See* K.S.A. § 8-133(a) ("The license plate assigned to the vehicle shall be attached to the rear of the vehicle and shall be displayed during the current registration year or years."); K.S.A. § 8-149 (a violation of K.S.A. § 8-133 is a misdemeanor punishable by fine and/or imprisonment); K.S.A. § 8-142 (operating a vehicle "which does not have attached thereto and displayed thereon the license plate or plates assigned thereto by the division for the current registration year" is unlawful); K.S.A. § 8-149 (a violation of K.S.A. § 8-142 is a misdemeanor punishable by fine and/or imprisonment).

[4] *See* K.S.A. §§ 8-235(a), (e) (driving without "a valid driver's license" is a misdemeanor); K.S.A. §§ 40-3104(d), (g)(1) (failing to display proof of liability insurance upon demand by a law enforcement officer is a misdemeanor); K.S.A. § 8-142 (operating a vehicle without valid registration is a misdemeanor).

stop and briefly seize the truck, and Thornton confirmed the basis contemporaneously when he told Madden the plate was "removed." (Thornton Video at 4:09:44–4:12:56.) The initial stop was therefore lawful.

### 2.   Officer Had Probable Cause to Handcuff and Search

Next, Madden argues that he was handcuffed immediately upon contact, converting the *Terry* stop into a de facto arrest unsupported by probable cause, and that the 9mm round recovered from his pocket was therefore the fruit of a search incident to an unlawful arrest. (Docs. 28 at 8–9; 41 at 3–5.) The government responds that ordering Madden out of the vehicle and handcuffing him were reasonable safety measures that did not convert the detention into an arrest; that the officers had probable cause to detain him for several offenses; and that the protective sweep and the search were lawful. (Doc. 37 at 11–20, 22–24.) The court agrees with the government.

Police may order a driver out of a lawfully stopped vehicle as a matter of course pending completion of the stop. *Maryland v. Wilson*, 519 U.S. 408, 415 (1997). Further, handcuffing an individual is evaluated under an objective standard. *United States v. Canada*, 76 F.4th 1304, 1307 (10th Cir. 2023) (holding that when courts assess reasonableness, they ought to "defer to the ability of a trained law enforcement officer to distinguish between innocent and suspicious actions."); *United States v. Fonseca*, 744 F.3d 674, 681 (10th Cir. 2014) (explaining that courts ought to avoid "engag[ing] in unrealistic second-guessing of a police officer's decision."). Precautionary measures such as handcuffing are permissible during a traffic stop where the facts available to the officers would warrant a reasonable officer believing the measure was an appropriate safety precaution.

Here, Madden refused approximately eleven lawful orders to exit his vehicle, all of which were given after Madden failed to provide any documentation as required by lawful order. Based

8

on Madden's stubborn refusal to comply with Thornton's repeated orders to step out of the vehicle, combined with Madden's escalating agitation as demonstrated by his verbal responses to the officers as this situation unfolded (Thornton Video at 4:09:44–4:12:56), Page and Thornton were clearly justified in handcuffing Madden when they got him out of the truck. Indeed, by the time officers detained Madden, they knew the tag was removed, Madden had refused to produce any documentation and refused repeated lawful commands to exit a vehicle with tinted windows that hindered officers' sight. Such circumstances—which go beyond the officer's subjective knowledge of Madden's status as a gang member and violent history—made handcuffing a reasonable measure to ensure officers' safety.

Moreover, even if the handcuffing amounted to an arrest, it was supported by probable cause. A warrantless arrest is reasonable where the officer has probable cause to believe the suspect committed a crime in his presence. *Wesby*, 583 U.S. at 56–57. When Madden was handcuffed, the facts supplied probable cause to believe he had committed several arrestable misdemeanors, including displaying a removed tag and failing to produce a license, registration, and insurance. That the officers articulated subjective reasons does not matter, because the inquiry is objective. *Apodaca*, 443 F.3d at 1289. Madden's contention that the grounds for his handcuffing were assembled "in hindsight" fails.

The protective sweep conducted by Thornton immediately after removing Madden from the vehicle was also lawful. To justify a protective sweep, officers must have reasonable suspicion that the suspect (1) "is dangerous" and (2) "may gain immediate control of weapons." *Michigan v. Long*, 463 U.S. 1032, 1049 (1983); *United States v. McGregor*, 158 F.4th 1082, 1091–92 (10th Cir. 2025) (holding that reasonable suspicion for a protective sweep is a "totality of the circumstances" analysis). Here, Madden's history of violence and gang affiliations, which was

9

known to Thornton and Page due to prior encounters, *see supra* n.2, combined with his refusal to comply with lawful orders to exit the vehicle amounted to reasonable suspicion sufficient to consider Madden "dangerous" under the first prong. *See McGregor*, 158 F.4th at 1097–98 ("Gang affiliation can support a finding of reasonable suspicion that an individual is armed and dangerous."). Further, despite the fact that Madden was handcuffed at the time of the sweep, the Tenth Circuit has found protective sweeps constitutional when the suspect was sitting in the patrol car with an officer as well as when a suspect stood handcuffed behind his vehicle—just as Madden was here. *See*, *e.g.*, *United States v. Dennison*, 410 F.3d 1203, 1210–13 (10th Cir. 2005); *United States v. Palmer*, 360 F.3d 1243, 1247 (10th Cir. 2004). As to the second prong, "an officer must have reasonable suspicion that a suspect . . . may gain immediate access to a weapon." *Canada*, 76 F.4th at 1307. The Tenth Circuit has explained this can happen in multiple scenarios—two of which that are particularly relevant to the instant matter occur when: the suspect could "break away from police control and retrieve a weapon from his automobile" or "the suspect may be permitted to reenter the vehicle before the . . . investigation is over, and again, may have access to weapons." *Id*. at 1309. Here, both are satisfied. Thornton testified that he had reason to believe that weapons may be found in the vehicle and based on the same factors supporting Madden's dangerousness and refusal to exit the vehicle, believed that any firearms could be retrieved if Madden broke away. Further, Thornton testified that Madden had not then been placed under arrest and therefore, he may have been permitted to reenter the vehicle before the investigation was over. The court holds this testimony satisfies the second prong justifying a protective sweep. Accordingly, Thornton had reasonable suspicion to sweep the vehicle.

During the sweep, however, Thornton observed methamphetamine and a .22 round in plain view. *Harman v. Pollock*, 586 F.3d 1254, 1264 (10th Cir. 2009). Once the methamphetamine and

10

a live cartridge was discovered, the officers had probable cause to search Madden's person, which they did. And as a result of the search, a 9mm round was found in Madden's pocket, and knowing that he was a felon, this gave the officer's probable cause to arrest him, which they did. *See Atwater v. City of Lago Vista*, 532 U.S. 318, 354 (2001) ("If an officer has probable cause to believe that an individual has committed even a very minor criminal offense in his presence, he may, without violating the Fourth Amendment, arrest the offender.").

Finally, Madden argues that the length of the traffic stop—approximately three hours—was so excessively long that it amounted to an unlawful arrest. (Docs. 28 at 9–10; 41 at 5.) That argument is unavailing. As explained above, prior to officers detaining Madden, they had probable cause to believe that he committed a traffic offense. Within minutes, officers restrained Madden for failing to comply with their order to exit his vehicle. And then within minutes of that, they had probable cause to arrest him. Madden fails to point to any authority indicating that the length of this stop violated his constitutional rights. To the contrary, "[a]n officer can always prolong a traffic stop with reasonable suspicion of criminal wrongdoing." *United States v. Baker*, 108 F.4th 1241, 1248 n.3 (10th Cir. 2024). Here, the length of the detention, even though it concluded with Madden's release, did not amount to a constitutional violation. Due to the court's ruling, it need not reach the government's alternative theories. In sum, the .22 round is admissible.

### 3. Madden's Statements Are Not Subject to Suppression

Madden moves to suppress certain February 26 statements arguing that once handcuffed (Thornton Video at 4:12:05), he was subjected to a custodial interrogation and was not read his *Miranda* warnings until 1 hour and 12 minutes later. (*Id*. at 5:24:39–5:25:13; Doc. 41 at 7.)[5]

---

[5] In Madden's original motion, he also moved to suppress all statements from February 26 on the grounds that the government had not produced body-camera footage and therefore argued that Madden invoked his right to counsel. (Doc. 30 at 14–15.) However, in his reply, Madden concedes that at least some of that footage had been turned over

In *Miranda v. Arizona*, the Supreme Court found that without proper safeguards, custodial interrogation "contains inherently compelling pressures which work to undermine the individual's will to resist and to compel him to speak where he would not otherwise do so freely."  384 U.S. 436, 467 (1966).  *Miranda* warnings are only required when a defendant is in custody and subject to interrogation.  *Rhode Island v. Innis*, 446 U.S. 291, 300 (1980).  A person is in custody for *Miranda* purposes when he is formally arrested or his freedom of action is curtailed to a degree associated with a formal arrest.  *Berkemer v. McCarty*, 468 U.S. 420, 440 (1984).  A confession is involuntary and offends due process when the defendant's "will has been overborne and his capacity for self-determination critically impaired."  *United States v. Pettigrew*, 468 F.3d 626, 637 (10th Cir. 2006) (citing *United States v. Lopez*, 437 F.3d 1059, 1063 (2006)).  When a defendant challenges a confession as involuntary, the burden rests on the government to prove "by a preponderance of the evidence that the confession was voluntary."  *Lego v. Twomey*, 404 U.S. 477, 489 (1972).  Under Tenth Circuit precedent, "[t]he determination of voluntariness is based on the totality of circumstances."  *United States v. Toles*, 297 F.3d 959, 965 (10th Cir. 2002).

At the hearing, the government played the bodycam footage which showed that after Madden refused to obey officers' commands to exit the vehicle, he was forcibly removed and handcuffed.  Shortly thereafter, around the time Madden was handcuffed, he would be considered in custody.  However, as the government points out, when Page was monitoring Madden while Thornton was sweeping the truck, Madden made a host of statements that were not in response to any questions by Page.  Rather, Madden made spontaneous remarks.  And volunteered statements of this sort are not barred.  *Miranda*, 384 U.S. at 478 ("Volunteered statements of any kind are not barred by the Fifth Amendment" and "[a]ny statement given freely and voluntarily without any

---

in discovery and appears to abandon the invocation argument.  (Doc. 41 at 7.)  In any event, upon the court's review of the bodycam footage, any invocation argument would be meritless.

compelling influences is, of course, admissible in evidence."). The single pre-*Miranda* remark that Madden seems to challenge occurred when Page discovered the 9mm round in Madden's pocket and Madden admitted he found the round on his porch, knew that it was in his pocket, and stated he picked it up intending to discard it. (Page Video at 4:12:33–4:17:12.) The bodycam footage from the hearing establishes that this statement was not made in response to any police questioning. Thus, the government carried its burden of showing that Madden's pre-*Miranda* statements were voluntary. Therefore, no statements from February 26 are subject to suppression.

Finally, Madden seeks to suppress his statements made after he was given a *Miranda* warning on the grounds that the officers employed a two-step interrogation strategy—that is, getting Madden to make a statement, getting a *Miranda* waiver, and then having Madden make the same statement. The facts do not support Madden's argument. Here, as discussed, Page's bodycam footage indicates that questioning never took place. Rather, Madden made spontaneous and volunteered remarks. Eventually, Thornton advised Madden of his *Miranda* rights, and Madden stated he understood them and agreed to answer questions. (Thornton Video 5:24:39– 5:25:13.) A waiver is valid if knowing, voluntary, and intelligent under the totality of the circumstances. *Toles*, 297 F.3d at 965; *Pettigrew*, 468 F.3d at 637. On this record the court finds Madden's waiver was knowing, voluntary, and intelligent, and the subsequent statements were the product of a free and unconstrained choice. Further, the record is absent of facts indicating that the officers employed a two-step interrogation strategy.

### 4. Madden Lacks Standing to Suppress Piersall's Statements

Finally, Madden seeks suppression of passenger Terran Piersall's statements as derivative evidence tainted by the February 26 stop. (Docs. 28 at 11; 30 at 16.) The government responds that no illegality occurred and that Madden cannot suppress another person's statements. (Doc.

37 at 30.)  As explained above, the February 26 stop, detention, arrest, and searches were lawful, so there is no antecedent violation whose fruit Piersall's statement could be.  Second, even if there were, Fourth Amendment rights are personal: suppression may be urged only by one whose own rights were violated, not by someone "aggrieved solely by the introduction of damaging evidence." *Alderman v. United States*, 394 U.S. 165, 171–72 (1969).  Piersall's statement followed the search of her own person and belongings.  The request is denied.

In summary, the court finds no violation of Madden's Fourth Amendment rights regarding the February 26 traffic stop.  Madden's motion for suppression as to evidence from that day is accordingly denied.  The court now moves to Madden's police encounter the following day.

## B.  February 27, 2025

### 1.  The February 26 and 27 Encounters Were Separate

Madden argues that the February 27 contact was not independent of the February 26 stop but a continuation of the same investigation, so that the evidence recovered is fruit of the poisonous tree.  (Docs. 29 at 5–6; 42 at 4.)  The government responds that there was no violation from the February 26 stop, that the evidence would have been discovered regardless, and that any connection is attenuated.  (Doc. 38 at 21–28.)

A derivative-evidence claim requires an antecedent Fourth Amendment violation.  *United States v. DeLuca*, 269 F.3d 1128, 1135 (10th Cir. 2001) ("[I]n a derivative evidence claim, the defendant must make a threshold showing that the challenged evidence is tainted by the earlier Fourth Amendment violation.").  Stated another way, without an initial violation, there is nothing for the fruit-of-the-poisonous-tree doctrine to reach.  As explained above, the February 26 stop and the ensuing detention, arrest, and searches were lawful.  That conclusion is dispositive: with no prior violation, the February 27 evidence cannot be suppressed as its fruit.  Madden's factual

point—that officers recognized him—does not change the analysis, because recognizing a suspect is not itself a constitutional violation. The lawfulness of the February 26 stop forecloses any claim that the February 27 evidence was come at by exploitation of an earlier violation. Moreover, there is no evidence of "a factual nexus between" the February 26 and 27 encounters beyond Madden being at both. *United States v. Torres-Castro*, 470 F.3d 992, 999 (10th Cir. 2006). Therefore, the court need not reach the government's alternative arguments. The encounters were independent.

### 2. Officers Community Caretaking Function Justified a Brief Detention

Madden argues that the community-caretaking doctrine authorizes only emergency assistance, not a criminal investigation and that the officers' conduct—running criminal checks within minutes of arrival—shows the welfare check was a pretext. (Docs. 29 at 7–8; 42 at 1–2.) He relies principally on *Case v. Montana*, 607 U.S. 107 (2026). The government responds that the officers lawfully detained Madden under the doctrine because they reasonably believed he was intoxicated, and that any subjective investigative motive is irrelevant. (Doc. 38 at 11–16, 28–32.)

One exception to the warrant requirement is a seizure conducted pursuant to police officers' "community-caretaking functions," which allows, among other things, police to perform investigatory seizures of intoxicated persons who pose a hazard to the public. *United States v. Garner*, 416 F.3d 1208, 1213–15 (10th Cir. 2005); *Gallegos v. City of Colo. Springs*, 114 F.3d 1024, 1029 n.4 (10th Cir. 1997) (holding officers could detain an intoxicated person pursuant to community caretaking). "[T]o justify seizure for intoxication by alcohol, an officer must have probable cause to believe an intoxicated person is a danger to himself or others." *Anaya v. Crossroads Managed Care Sys., Inc.*, 195 F.3d 584, 591 (10th Cir. 1999); *United States v. Gilmore*, 776 F.3d 765, 769 (10th Cir. 2015) (internal quotations omitted) ("The determination of probable cause is based on the totality of the circumstances, and requires reasonably trustworthy

information that would lead a reasonable officer to believe, in this context, that the individual posed a danger to himself or others.").

Here, officers responded to a 911 report that a man was unconscious in a running vehicle at a gas pump for about an hour. Upon arrival by the officers and questioning, Madden was slow to respond, and Officer Johnson observed that his pupils were constricted, which in Johnson's training and experience indicated possible impairment. Those articulable facts gave the officers an objective basis to believe Madden might be intoxicated and unable to operate the vehicle safely, justifying a brief detention to assess his condition through field sobriety testing. *Garner*, 416 F.3d at 1213–15. Further, the detention was tailored to that purpose and lasted no longer than necessary, as Madden was arrested for suspected crimes before that inquiry was complete. *Id*. at 1213.

Madden's reliance on *Case v. Montana* is misplaced. *Case* did not address—much less impose—any rule governing when a community-caretaking encounter "transforms" into a criminal investigation. The sole question before the Supreme Court was whether the emergency-aid exception to the warrant requirement obligates officers entering a home to possess "probable cause" to believe an occupant is in peril, or instead some lesser quantum of justification. *Id*. at 107–08. The Court held that no probable-cause showing is required, reaffirming the settled rule that officers "may enter if, but only if, they have an 'objectively reasonable basis for believing' that an occupant faces serious danger." *Id*. (quoting *Brigham City v. Stuart*, 547 U.S. 398, 400 (2006)). That holding does not aid Madden. He invokes *Case* for the proposition that officers must develop independent reasonable suspicion of criminal activity before a welfare contact may "transform into" an investigation. (Doc. 42 at 2.) But *Case* announces no such requirement; it speaks only to the showing necessary to justify an emergency-aid entry in the first instance. In any event, Johnson noticing Madden's pupils being constricted, combined with the information

16

that he had been unconscious or asleep at the gas pump for over an hour in a running vehicle, provided the reasonable suspicion necessary to believe Madden may be intoxicated. Moreover, *Case* is distinguishable because it concerned entry of a home—the locus of the Fourth Amendment's most exacting protection—whereas this case involves a vehicle parked at a public gas pump. *California v. Carney*, 471 U.S. 386, 392 (1985) (lower expectation of privacy in vehicles compared to homes). Here, officers briefly detained a motorist in a public lot to determine whether he was fit to drive. If anything, the privacy interest in the vehicle setting makes the officers' caretaking detention easier to uphold.

Finally, Madden's pretext theory fares no better. Even assuming the officers harbored an investigative interest, that subjective motive does not render their objectively justified conduct unreasonable. The officers possessed specific and articulable facts—a report of a man unconscious at a gas pump—that objectively warranted a brief detention to assess his sobriety. "An action is reasonable under the Fourth Amendment, regardless of the individual officer's state of mind, as long as the circumstances, viewed objectively, justify [the] action." *Brigham City*, 547 U.S. at 404 (internal quotations omitted). Whether the officers suspected Madden of wrongdoing did not strip them of their obligation to ensure he was fit to operate a vehicle. The brief detention was lawful.

### 3. Officers Were Justified to Arrest and Search Madden and His Vehicle's Trunk

Next, Madden argues that the arrest lacked a lawful foundation, that the street sign and the methamphetamine were observed only after officers had already escalated the encounter, and that the trunk search exceeded the search-incident-to-arrest rule of *Arizona v. Gant*, 556 U.S. 332 (2009). (Docs. 29 at 9–10; 42 at 2–7.) The government responds that the sign and the suspected methamphetamine were in plain view, that the positive field test gave probable cause to arrest, that

the search of Madden's person was incident to that lawful arrest, and that the trunk search was lawful under the automobile exception.  (Doc. 38 at 17–21, 33–36.)

The plain view doctrine applies if the government shows: "(1) the officer was lawfully in a position from which to view the object seized in plain view; (2) the object's incriminating character was immediately apparent–i.e., the officer had probable cause to believe the object was contraband or evidence of a crime; and (3) the officer had a lawful right of access to the object itself."  *Harman*, 586 F.3d at 1264 (quoting *United States v. Soussi*, 29 F.3d 565, 570 (10th Cir. 1994)).

Here, while Madden was performing the field sobriety test to which he consented, officers looking through the windows from a lawful vantage point observed a "Hoover" street sign[6] in the back seat and a white crystalline substance on the front passenger seat consistent with methamphetamine.  The incriminating nature of what the officers viewed was immediately apparent, allowing the officers to open the passenger door and test the substance.  Officer Clayton did just that and his positive field test of the substance established probable cause to arrest Madden for possession of methamphetamine.  *See Wesby*, 583 U.S. at 56–57; *Martin*, 613 F.3d at 1302.  Because the arrest was supported by probable cause, the search of Madden's person that produced the .22 rounds was a lawful search incident to arrest.  *See Robinson*, 414 U.S. at 224–25.  And as the government points out, the trunk search was proper under the automobile exception, which allows "police [to] search an automobile and the containers within it where they have probable cause to believe contraband or evidence is contained [therein]."  *United States v. Stewart*, 473 F.3d 1265, 1270 (10th Cir. 2007) (quoting *California v. Acevedo*, 500 U.S. 565, 580 (1991)).  "Probable

---

[6] During the June 4 encounter, Madden volunteered to Officer Johnson that he was an "active gang member." (Johnson Video at 17:08:39–17:08:49.)  Johnson testified that he knew Madden to be affiliated specifically with the Hoover Street Crips because of Madden's gang designation in the WPD computer database following officers running his name.

cause to search a vehicle is established if, under the totality of the circumstances, there is a fair probability that the car contains contraband or evidence." *United States v. Bradford*, 423 F.3d 1149, 1159 (10th Cir. 2005). Here, the methamphetamine on the passenger seat and the street sign established probable cause that additional contraband might be found in the vehicle, which authorized the search of the trunk that produced the boxes of ammunition. The underlying detention and the plain-view observations were lawful. The arrest and the resulting searches are upheld.

### 4. Madden's Statements, Prior to His Request for an Attorney[7], are Not Subject to Suppression

Finally, Madden moves to suppress his February 27 statements, arguing that he was in custody from the moment he was directed out of the vehicle until he requested his attorney. (Docs. 30 at 5–7; 42 at 6–7.) The government contends those statements are admissible because, before Madden was escorted away for field sobriety testing, he was detained in a manner equivalent to an ordinary roadside stop rather than under restraint associated with formal arrest, and further, any volunteered remarks are not protected. (Doc. 38 at 36–39.)

*Miranda* applies only to custodial interrogation, and a motorist temporarily detained during an ordinary roadside stop is not in custody for that purpose. *Berkemer*, 468 U.S. at 440. Before officers escorted Madden to perform field sobriety tests, the encounter involved the earmarks of an ordinary stop—it was public and brief in character—and Madden was not restrained to a degree associated with formal arrest. Therefore, his pre-arrest statements did not require *Miranda* warnings to be admissible. *Berkemer*, 468 U.S. at 440 ("The similarly noncoercive aspect of

---

[7] Madden moves to suppress any statements made after requesting Phillip White on the basis that it amounted to an invocation of his right to counsel. (Doc. 30 at 8–12.) At the hearing, the government stipulated that it will not introduce at trial any statements Madden made after he asked for White, to the extent they were not volunteered. Accordingly, Madden's motion is denied as moot to the extent it seeks suppression of any statements made after he invoked that were not volunteered.

ordinary traffic stops prompts us to hold that persons temporarily detained pursuant to such stops are not 'in custody' for the purposes of Miranda.").  In addition, Madden's volunteered remarks—including that he had "just bought" the Cadillac, that he was an active gang member, and that the rounds found in his pocket came from his yard—were not the product of interrogation; but rather, were volunteered. *Miranda*, 384 U.S. at 478 ("Volunteered statements of any kind are not barred by the Fifth Amendment.").  Accordingly, Madden's statements made before his request for counsel, and his volunteered statements, are not subject to suppression.

## IV.     Conclusion

THEREFORE, Defendant's motions to suppress (Docs. 28, 29, 30) are DENIED IN PART and DENIED AS MOOT IN PART.

**Jury Trial in this matter is scheduled for August 24, 2026, at 9:00 a.m., Courtroom 238, U.S. Courthouse, Wichita, Kansas.  A Status Conference is scheduled for August 10, 2026, at 9:00 a.m., Room 232, U.S. Courthouse, Wichita, Kansas.**  The court on his own motion pursuant to 18 U.S.C. 3161(h)(7)(A) orders that the time from 06/30/2026 (the date the motion to suppress was ruled on) to 08/24/2026 (the date the court set for jury trial) shall be excluded in computing time under the Speedy Trial Act, because the ends of justice served outweigh the best interest of the public and the defendant in a speedy trial.

IT IS SO ORDERED.  Dated this 30th day of June, 2026.

        s/ John W. Broomes
        JOHN W. BROOMES
        CHIEF UNITED STATES DISTRICT JUDGE

20